Good morning, panel. My name is Richard Cronin. I represent Mr. Detroy in this case. Thank you for making argument in this case. I guess the other thing is allowing me to go first. I sort of feel like I'm the sacrificial lamb here this morning. Well, thank you for making the schedule for it. Where do I begin? The question I think for the panel to determine in this case deals with the Honolulu police officers and the execution of a search warrant and what occurred in the course of the execution of that search warrant. I'd like to say that the information that a judicial officer relies on in terms when it comes to an affidavit is only as good as the information that a police officer gives that magistrate or district judge, whoever the case may be. In this case it was a district judge. In the case of State of Hawaii v. John Detroit, he was convicted at trial. The case was then appealed and the Hawaii Supreme Court determined the issues of the matters contained in the affidavit to the search warrant. In one of those rare cases, the Hawaii Supreme Court ruled that as the matters contained in the search warrant... But isn't your main problem that KILO, which was the linchpin of the reversal, was not clearly established law at the time of the search and therefore relied upon for qualified immunity purposes? Is that not the problem? No, Your Honor. I think the problem is even taking out that fact of I think it was the thermal imaging... You now need to put it in rather than taking it out. I'm sorry? You now need to put it in and you need to say what a reasonable police officer who had this information because we can't remove it because it wasn't clearly established at the time. Well, the problem, Your Honor, I think really goes back to what was any other corroborating information that this officer had. And essentially he had zero. And it wasn't until the thermal imaging device was used on this apartment that he was able to go and take all the information and give it to... So once you put the... That's why I said you had to put it in, not take it out. So once you have the thermal imaging information in, why would no reasonable officer have done this? Well, I think that the thermal imaging in and of itself would have been insufficient to establish the probable cause to get the affidavit for the search warrant issued. But you can see, don't you, that if you couple the thermal imaging with all the other information that was in the affidavit, there would have been probable cause. Well, that's correct, but then you have to... And Burzon's point is that if the U.S. Supreme Court subsequently comes along and takes that thermal imaging evidence out, declaring that it's illegal without a warrant, then you may very well have an invalid affidavit in support of the search warrant without that key piece of evidence. But how would a reasonable police officer know before Shillow was decided that he couldn't rely on a thermal imaging device that had been employed without a search warrant? Well, he wouldn't. And that's essentially... Don't you then lose on the... No, because I... It's not as clearly established at the time the warrant was... that is misleading or has not been put in to clearly delineate all of the relevant facts so that the officers... But just looking at all of the other information that the officer put in that search warrant, if he is putting in information that is somewhat misleading, he's not providing the full truth. In other words, he's not providing the full facts. What specifically are you talking about? Well, I'm talking specifically of the fact that he was unable to corroborate any of the information that the anonymous informant gave him to lead to suspected marijuana. What about the thermal imaging? Didn't that corroborate what he was told? No, all the thermal imaging did is just show that there was a heat pattern that was dissimilar to the rest of the units in the apartment. Which is consistent with growing marijuana in an apartment. Well, that may be. And consistent with excessive usage of electricity as shown by the Hawaiian Electric. Well, but even now, that's my next argument because it's excessive to what? Because the problem is that he's putting information in the search warrant about other people with a similar unit and claims that, well, it's a housewife. But the reality was he didn't know who owned that apartment next to him. Well, there could have been two girl operations. Well, there could have been. But the point is that there's a huge spike. You have to admit that. It's more than 50% in power usage between whatever those months were, December and January, or preceding this particular affidavit. And then he points the thermal imager at it, and lo and behold, it lights up like a radiated bomb site. Well, I don't know if it quite went like that. But the point, counsel, is it not that would a reasonable magistrate or reasonable police officer suspect at that point that there was an indoor growing operation? And that's pretty good evidence to have probable cause to believe that something illegal is going on. Well, that may be. But my main problem with this is that I feel the officer was somewhat misleading to the district court judicial officer because of the fact he just, instead of saying, you know what, I went, I got this anonymous tip, I went, I've investigated it, I can't corroborate anything that this guy said. But I did put the thermal imaging on it. So if you think there's sufficient PC, then give me the warrant. I'll go look. But I don't understand why, with the thermal imaging evidence and the utility records and the tip that had been provided to him, that he'd corroborated with the records and the imager, that a reasonable police officer wouldn't conclude at that point that he did have probable cause. Well, but the problem is that you're dealing with an anonymous, unknown informant who's... Actually, that's not true as I understand it. No, that is true. My understanding is that he was known to the police. No, he was not. It was an anonymous informant. Anonymous, meaning he wanted to be anonymous, but not that he wasn't known to the police. No, I believe... He didn't just call up and leave a message. The police officer knew who he was. Isn't that true? I don't think that was the case. That's my understanding. I don't... But we don't have any, you know, history of the guy. The police officer doesn't say, well, he's been accurate in the past. But it was not anonymous in the sense that he was hiding his identity from the police officer. Well, all I can say is that it's anonymous. And if it's an anonymous tip, then it would certainly mean that his statements and the credibility would even be less than somebody that had been used in the past, that had been corroborated and known to be reliable and truthful. Counsel, I'm looking at paragraph one of the affidavit establishing probable cause. And it reads, your affiant received a call from a person who wanted to give information regarding a possible indoor marijuana grow operation. This person wished to be kept anonymous and from this point on will be referred to as an informant. I read that as saying the person may very well have identified himself to the officer but wanted a promise of confidentiality that his identity would not be revealed. So why can't I read that language that way? Well, you could read it that way. But on the other hand, you could read it even if he did tell him who I am. It's certainly somebody that is not known to the officer. The affidavit doesn't say that I know this person. He's provided information to me in the past. This is somebody that's just calling up saying I think there's an indoor grow operation. But he also, and I hope you're going to get onto the media issue right after this. Yes. But this isn't a case where they just took this information and went in to get a warrant. They did do a fair amount of investigation after that. They looked at electrical records. They looked at the arrest record, although I'm troubled about relying on arrest records when there was no conviction. They looked at, they did this thermal imaging thing. And they went and looked at the place to see if it basically matched up. Yes, there was an air conditioner in the place. He said there would be an air conditioner. So they didn't simply, no, there wasn't an air conditioner where he said there would be an air conditioner. No, there was. I mean, you know, but there's an air conditioner in every one of the units. Well, that's true. And if they had gone in at that point, it would have been a big problem. But they didn't go in at that point. He went and he did a substantial amount of corroborating information. And the Kylo point is sort of interesting and fluky. But given that, given the timing with regard to Kylo, I just think you've got a big problem. Well, that may be. What about the media issue? All right. I think it's even more troublesome, Your Honor. I mean, even putting that aside, if you decide that there is a sufficient basis for the district court to rely on the information and that in terms of the Fourth Amendment violation and the civil ramifications, it's nothing there. I think certainly the biggest issue of looking at this case is allowing a TV news crew to come into his apartment in the course of the search. There is a federal statute on point when it comes to that. The federal statute doesn't apply to Honolulu police officers. It applies to federal officers. Well, that may be. But, Your Honor, the simple fact of the matter is.  Well, if the law doesn't apply to local law enforcement officers, you can't erect it as a barrier to state officer action if it doesn't apply to them. Well, that may be. But I think that it certainly sets forth a minimum standard. I mean, would you suggest that. Well, excuse me. But if the Supreme Court issues an order and a state court does not have that order in place, would you be suggesting that we don't follow the Supreme Court? That's really not analogous because a constitutional rule is a constitutional rule. A statute applies to whoever it applies to. And it doesn't apply to these officers. But why don't you go on from there? There was also a Ninth Circuit case at the time, so that's a little better ground. Well, before you get to that, did you or was there alleged in the complaint any facts concerning the presence of the media? There was an allegation of negligence and I believe an invasion of privacy. As to the actual, I don't believe there was in all candor. And secondly, I'm concerned about the fact that this is referred to in the briefs as a state law claim. Well, it would have been. Are you standing on that, that this is a state law claim and not a 1983 claim? Yes, and that's the point of the appeal is that I think that the district judge was wrong in not allowing us to pursue these claims down on the state court level. If the civil rights violation had not been met, then certainly we should have been able to prosecute this case on the state level. So you want a remand on this issue? Was this case originally filed in state court? No, it was not. It was filed based on the 1983, on the 42 USC. But you raised this issue in federal court? Yes. So why should he let you go to state court if you raised it in federal court? Well, that's the whole point. It says that the district judge granted summary judgment and dismissed the entire case. But that doesn't preclude you from filing a state action for trespass in state court. Well, if it's dismissed in the federal court, I believe it would, wouldn't it? It doesn't state it. It's dismissed on the grounds that it doesn't state a Section 1983 cause of action, meaning that you have no federal civil rights. That's not collateral estoppel to preclude the plaintiff from refiling a state court action. Well, the problem is that the problem is that the district judge dismissed us to all claims. That was the problem. But you didn't – I mean, this is a really bizarre procedural mess because there's – we can't even figure out what the claim is because there's nothing in the complaint. How exactly did this even get to issue in the district court when it's not in the complaint? It got to issue because in the course of conducting the discovery, it was discovered that a videotape with the news media was involved and – I see. And then you didn't have the tape until you got the tape. That's correct. Well, was there a motion to amend the complaint to add a 1983 claim for this invasion of privacy? No. You don't – so I'm still confused about what you think was here. Do you think there was a 1983 cause of action for the media invasion of privacy? I think that – To make such a claim? I think that given the federal statutes and the federal rules, I think that there may have been. But was it litigated in this case? It was originally not litigated until we got into the case and discovered that the news media had been allowed in in the course of the – All right. The district court did make a decision on it. Are you contesting the district court's decision? Yes, I am. Including to the degree it's based on 1983 law? Yes. You think it's wrong that there was qualified immunity? Yes. Why don't you argue that? You haven't done that yet. That's a good question. Right. Right. Well, the issue to qualified immunity is I don't think the officers – if you're discussing the news media issue, I don't think there is a question of qualified immunity because the only people that would have had the ability to allow those news media people in there would have been the police officer. It would not have been Mr. Detroit. When police officers went into place, they had control and they had the ability to say who's going to come in and who's not going to come in. Well, he's still the owner of the property. I mean, he could say to a – let's assume that the news crew arrived and somehow they found out about the execution of the warrant and a news crew arrived and showed up at the door. As a homeowner, is it your position that he doesn't have the right to tell the reporter and the cameraman, get out of my house? At that point, he's not in control because the police are executing in the course of executing a search warrant. Well, that's true. They are taking over the premises, but he's still the homeowner. That may be. He hasn't lost his Hawaii property rights in the residence. Well, I think in the course of the police executing a search warrant they have and certainly allowing somebody into a residence while they're conducting a search warrant is – and I know that you, this panel, has heard numerous search warrant cases. I don't know how many times have you ever heard of the police executing a search warrant and having a news media or anybody being allowed into a premises while the police are executing a search warrant. It doesn't happen. And the only reason it does happen is because the police allow them to come in. It's the only reason why. But that doesn't – that's not really the point I'm asking about. I'm saying – and I assume this is part and parcel of your trespass and invasion of privacy claim. He still has the right, does he not, as the homeowner to say, I don't want you people here. I don't want to be on camera. Get out of here. He may have. He may have, but I would say my position is that regardless of his property rights,  it is, to put it out to an extraneous argument, it's no different than a landlord giving the premises to a tenant. And it's sort of the same – I mean, if you can extrapolate that analogy out. But it's sort of like, you know, we're the police. We're here now. We're doing this job. You can come in after we're done, but not while in the course of it. And then not allow the news media to not only interview Mr. Detroit, but then have the police take them through the house. Did you do any discovery about how they came about immediately to be there? You know, we did, and it was one of those situations. Nobody seems to remember how it happened. So is there anything in the record at all? No, because nobody knows. The officers don't know. Nobody would take responsibility for allowing them in. And it was just sort of, well, we've got this tape that HPD made showing the news media there. And who made the videotape? Well, we don't know. Well, clearly the media has a right, do they not? I mean, film at 11. You know, they show up at a crime scene and start, you know, taking pictures. And they do the little on-camera thing in front of the house and all that stuff. They have a First Amendment right to do that. Sure they do, but only to the extent that the law enforcement officers would allow them to come in and do that. And it's not until after the law enforcement have gone in, secured the scene, gotten the evidence that they need, and certainly not in the course of executing a search warrant. Well, I will grant you it's unusual to see the media actually come into a crime scene, and the only way they would do it would be if the police allowed them to do it. There's no question about that. But does it make a difference from a constitutional point of view? Yes. Let me finish the question before I start answering it. I'm sorry. I have an orange light here. Does it make a difference whether they were riding along, so to speak, versus carrying out their news duties and happened to show up at the scene and no officer in charge of the scene had the presence of mind to tell them, don't come in with your camera? Would that make a difference in your view of the law? No, because my view of the law is that if the police are executing a search warrant, they come in. I think the second part of this that I think is egregious is when you look at the videotape, you see Mr. Detroit down there, and what is happening is you're having Mr. Detroit making admissions to the news media about the grow. And so now all of a sudden, even though you don't have law enforcement officers conducting an interrogation, they're somewhat circumventing his constitutional rights to remain silent by having the news media getting up there and asking, well, what do you think about this? He didn't have to answer the question, and this wouldn't be the first time in the history of Maine that somebody made statements to a member of the news media that were later used against them. Well, that's right, but not in the context of having the law enforcement officers standing around there while this interview is being conducted. But he didn't have to answer the question, is my point. I mean, he chose to answer the question. He didn't have to do that. Well, that's right. He didn't have to, but at the same time, had the HPD followed their own policies and procedures, as well as – Then he wouldn't have incriminated himself. That's right, because the news media would not have been there. Where is the policy and procedure? I see there's something in the record, but I don't understand where it says that they're not supposed to do this. I made a reference in it. I don't – at the top of my head, I don't have it. I see. I don't have it at the top of my head, but there is – I know that there was a policy procedure. But you still haven't told us much about the qualified immunity question with regard to any 1983 cause of action. I mean, there is at this point pretty much uniform – well, there's a Supreme Court case now, but it wasn't until 1999 that says essentially that having the media come in under these circumstances is a constitutional violation. But that was in 1999. As I pointed out, there were, I believe, two other cases. They were from other districts. Well, there was a Ninth Circuit case. You see, that's what you're not dealing with. There was a Ninth Circuit case that was decided a month before the search. Yes. What about that? The Hanlon case? That case, I believe, would have set forth at least some notice. I guess the point is this, is that there was sufficient notice that would have put anybody on – that they would have known that this type of procedure is not appropriate. Okay. Thank you very much. We'll give you a minute or two in rebuttal. Thank you. Good morning. I'm Richard Llewellyn, attorney, Deputy Corporation Counsel with the City and County of Honolulu. Could you just pull that up a little? Thank you. I'm sorry. I tend to speak in a low voice. I'm Deputy Corporation Counsel Richard Llewellyn here on behalf of the appellate officer, Jonathan Wong. I only have a few brief things to point out. What about the media and the qualified immunity question? I think the court touched upon an important point. In 1999, there seems to be a consensus by the United States Supreme Court that – All right, but there was a case in this court before this search saying this very thing. What about that? The Hanlon case? Yes. Did that not go to the Supreme Court? It was disputed. It did, but at the time of this search, there was Ninth Circuit law that said you can't do this. It was on appeal, and as long as it was on appeal, are the officers put in the position that they have to – Well, it was a pretty good guess anyway, and there was a bunch of other case law, and there was no law of the contrary anywhere. Is that right? Constitutional law. Well, I thought there was a split in the circuits. No, there was a split in the circuits on qualified immunity. There was no split in the circuits on the merits. I understood there to be a split in the circuits. Well, there wasn't one. Okay, then I'm mistaken. I don't think that the officer should be forced to bet which side is going to win or lose until the case is ultimately resolved. I take it your office had not issued any kind of directive to the Honolulu Police Department not to do this after Hanlon was decided. After this event? Well, within a month or so of the – in December of 1997, on or before. I'm not aware. I'm not aware of that. I wasn't with the office at that time, but I'm not aware of any such directives or orders being issued. Was there a policy – what does this policy statement show? I have it, but I didn't seem to show anything. What does it say? That you're not – that the officers are not to present and pose arrestees for the convenience of the media is what is the argument that Appellant has put into his – to his brief. And this was – you think what happened here was not that? No, Your Honor, I do not. I think if you look at the film, which the film is really all we have on the record of it, that Mr. Detroit is volitionally speaking with the press. Well, but wait a minute. He's sitting there in handcuffs, and the speaking isn't really the point anyway. The point is that they came in there long before anybody talked to him. They were taking photographs, and they were asking the police, is it okay if we take photographs here? What if I take photographs here? There was interchange between them and the police. The police at one point, I think, said to them, here, come over here. So the police and they seem to be in some joint project with regard to having the media show what was going on before anybody talked to Mr. Detroit. I don't know that they're in a joint project, but they're obviously accommodating the media on this. All right, okay. So let's leave what Mr. Detroit said completely out of this because there would have been a violation. He would have been – they never talked to him at all, right? Knowing what we know now, yes. Yes, okay. So forget about what he said or didn't say. Okay. Disallowing the media to come into the – And they were there for, what, 20 minutes or something? Quite a while. Approximately half of the videotape, I would say. How they came to be let in, I just don't have the answer to the court option. Well, at least the police ratified their presence. They didn't say get out. They did not say get out. They acquiesced, at the very least. I can't argue other than that. It's clear that they were talking with him. There's no objections. All right, so do you have any – you seem at points to be arguing that there wasn't, in fact, a constitutional violation, but you seem to be agreeing now that there was one. At the time, I think the officers – I'm asking a different question now. Okay. Now, looked at now, in terms of the state of the law now, do we agree that there was a constitutional violation? The state of the law now? Yes. Allowing media in, yes. Okay. So the only issue we have is a qualified immunity question. Correct. All right. And we have this very unusual sort of situation where there was a Ninth Circuit case, but as you point out, the time for cert hadn't been run. I don't even think the cert petition had been filed, but the time for cert hadn't been run is all that happened. And it was very close in time to this, and I still think that the officers acted objectively. So you don't think officers should be abiding by the circuit law unless and until it's overturned? I'm not suggesting that. So if we decide a case, that isn't clearly establishing the law? It certainly does. It is the law until the final. Okay. So there you go. So this was the law at the time, and they didn't bay it. It was very close. It was the law at the governing circuit at the time, and it was a perfectly good law case. It hadn't been vacated. I don't know this, but I bet that there was no cert petition filed yet because it was only usually filed 90 days later, not 30 days later. I don't know the answer to that. I don't know the answer, but more likely that it wasn't filed. I'm puzzled as to why we're talking about qualified immunity. In your brief, you indicated that this was a state law claim and that there was no citation to any state Hawaii law or that Hawaii law permits the defense of qualified immunity. That is true. That's the way that I briefed them. But you proceeded then to talk about the fact that the officers had qualified immunity. I did. That's confusing to me. I see the court's point. I don't know if I can – I don't know if I have the answer for the court regarding that. It appears that the district court judge also went down that path after listening to the appellant's argument. Yes, Your Honor. Is it your understanding that there was no 1983 claim made here or that there was a 1983 claim and a state law claim made here? That there was a 1983 claim? On the mediation. On the mediation? Well, as I read the complaint, I took it as a pending state law claim. Well, I'm not sure it's in the complaint at all. Where is it in the complaint in any version? Where is it in the complaint? Well, perhaps I'm mistaken. But Mr. Detroit's counsel argued to the district court that it was a state law claim and did so in his brief before us. That is correct, and that's the way I responded back in the hearing on the motion for summary judgment. But the state law claim, as I heard from Mr. Detroit's counsel, was for trespass and breach of privacy. And there is no qualified immunity to that under state law, right? I think that's incorrect. Is there? Yes. There's state qualified immunity? There is, yes, Your Honor. I think the case was reversed for other matters regarding statutes of limitations. I'm sorry? Now you've got me totally confused. I wish I could find a different term than qualified immunity, but do public officers have any kind of a defense to a state tort law claim for trespass or invasion of privacy? Forget about civil rights cases and federal qualified immunity. I believe that's what the state law case, the Orso case. So it's analogous to federal qualified immunity? It is. That seems to me. Has anybody briefed that issue in this case? No, Your Honor. All right. Judge King, in his opinions, does cite a case called Medeiros v. Condo. I don't know what that is. No one has discussed it before us. He says the immunity ruling applies with equal force to the state law claim C, e.g., Medeiros v. Condo. Do you know what that is? I think Medeiros is a progeny of the Orso case regarding public officials acting in their discretionary capacity as opposed to. And what does it say? Is it basically parallel to? Completely parallel, Your Honor. It's parallel. So basically we're just in the same place, whether it's a state law claim or a federal law claim. It would seem to be the same. So all this doesn't really matter very much is what you're saying because it's something, and whatever it is, the same standard applies. Is that basically what you're saying? I would submit that is correct. And your position with regard to the qualified immunity is that they are entitled to ignore a Ninth Circuit case decided a month earlier? No, Your Honor. I'm not saying they should ignore it. But they were entitled to regard it as not binding law. No, Your Honor. Well, what were they doing then? Well, it was not final until 1999. Whether or not the officers, when the law makes it around the circuit, there's nothing before the court. So what is the proposition? No Ninth Circuit case establishes clearly established law until what? Until the Supreme Court decides the same thing? Well, obviously I'm mistaken. My thought was that there was a split amongst the circuits that was dealt with in the Hanlon case. But the split was over whether or not it was clearly established at a certain time, right? That's what I understood. Okay, but the Ninth Circuit in November of 1997 had decided that it was established in the Hanlon decision that this amounted to a constitutional violation, right? It did. Okay, and then later in 1998 or 1999, the Supreme Court vacated Hanlon when it decided Wilson v. Lane. But the reason they vacated it was to simply allow the Ninth Circuit to revisit the question of at what date the law was clearly established. And then I didn't look at the subsequent history, but I assume in Hanlon they basically reinstated it and said it was clearly established in November of 1997. And that's when Appellee Officer Long's action was going on. It began in November. But if it was clearly established in November and he acted in December, then he should have followed it, shouldn't he? That's Judge Berthels. Well, point's well taken, but I'm not sure the state of the law had made it down the branches of the administration. Well, I mean, this whole discussion may be academic if there isn't a Section 1983 claim here, and I'm having a hard time finding one in this complaint based on the way it was plaid. So maybe we've just wasted 30 minutes of argument on a point that really is kind of irrelevant. But let's see. If it were a state law claim, presumably the qualified immunity standard would be the same, but the clearly established law would have to be clearly established state law? I would think so. If you're talking about if you're pleading it as a state law tort claim, it would need to have been recognized. It strikes me that one thing that's different about Hanlon is the point I was trying to talk to Mr. Grona about, and that is that there was a federal statute that applied to federal fish and wildlife agents in Hanlon that doesn't apply to Honolulu police officers in the state of Hawaii. So then the question would be whether there's an analogous state statute that was on the books. None that I've found. I could see nobody's made this argument, but it seems to me you might be able to distinguish the application of Hanlon on that basis. I did research the privacy issue regarding the media, and I found nothing. And am I correct that when Judge King dismissed this federal suit, that plaintiffs could have refiled their state law claims in state courts for trespass and for breach of privacy? I believe you're correct, because there would have been no finding on the merits regarding those underlying, if they're pendent in state courts, finding on the merits or facts of the case. Okay. Thank you, Counsel. Thank you. Thank you, Counsel. Counsel, I'll give you a couple minutes for a minute. Is there anything you can say that will clear up what the cause of action was here? Well, you know, the cause of action was generally pled. It is a notice requirement. It wasn't pled at all, in fact, that I could find. But it seems to have been sort of amended by practice here. Well, exactly. I mean, in all candor, to your honor, yes. We got into the case and discovered that not only was there questions on the underlying search warrant, but then we discovered that, you know, this tape was made and that the news media was allowed to come into his residence in the course of the execution of the search warrant. So a state law claim was discovered. So the state law claim was discovered. And there was no filing of a motion to amend the complaint to add that claim? No. In all candor to the court, no, I did not get the opportunity to make the request to file the motion for amendment. But it was litigated. At least in the briefs before us, you're citing only federal cases. Yes. All right. Now, because the situation, your honor, is this, is that there was no state law case on point at the time. And as a general rule of pleading, if the state law has not made a ruling, we then start looking to other jurisdictions to see how those other jurisdictions rule. Why would you make a state law cause of action when you had a perfectly good federal one? Well. With fairly established law. I mean, at least now, whether it was established then is a different question. But there's no doubt that it's established now. And quite honestly, your honor, knowing what I know now, I would be moving. If this case was still ongoing, if we would have survived the summary judgment, I would have filed a motion to amend to ensure that the ride-along was included along with the 1983 action. Well, you call it a ride-along. Well, ride-along, but I mean allowing the media in. The videotape that we've looked at, I assume, was filmed by a Honolulu police officer. That is my understanding. Okay. And so you discovered it in, what was it, the file of the public defender as part of the discovery that was turned over during the state criminal process? I think that's where it was uncovered. Okay. And then, of course, getting a copy of it took time, and then getting that. And then, of course, in the course of that happening, the motion for summary judgment was filed. Because the tape shows, what, about 20 minutes of the officers conducting the initial search of the GRO. And then in the middle of the tape, suddenly television news cameramen show up with tripods and Klieg lights and an attractive television reporter, well-flopped, comes in to do the interview. But we don't know. There's nothing in the record, I take it. And this is the great mystery. How did they get there? Did the police tip them off? They clearly let them in. There's no question about that. And you know what? That is the great mystery. Okay. That is the great mystery. And going to the issue of qualified immunity, the court was asking about the state. It's a condo case. There is qualified immunity, but the immunity does not extend to an officer and his discretionary function carrying that function out in a negligent manner. But we couldn't possibly deal with the state law. No, I understand that. If this is a state law cause of action, and only a state law cause of action, Mr. King obviously didn't think it was because he treated it as both. Yes. But if it was only a state law cause of action, there's been no briefing at all on the state of the state law. We couldn't rely on the state of the constitutional law. We'd have to know something about the state of the state law. Your Honor inquired with Mr. Llewellyn as to the condo case. My response to that is a matter of edification to the court, is how the state qualified immunity statute works, is that, yes, there is qualified immunity. There is no immunity if, in the course of a police officer or administrator carrying out an administrative duty, carries it out in a negligent manner. In what manner? Negligent manner. In other words, if he's negligent in carrying out the discretionary function, then he can be liable. But that would be a whole other ball of wax. It hasn't been briefed here. That's fine. It's just really bizarre how this thing developed. Okay, thank you very much. All right. Thank you. And the case of Detroit v. Sitting County of Honolulu is submitted. We will go on to Tan v. Gonzalez.
judges: Alarcon, Berzon, Tallman